We are aware of the classified documents in this case. The court does not intend to make reference to them during argument and I assume counsel do not either, but I caution you both set of counsel to be careful on that score. Well, that's correct, Your Honor, though it No, I understand you have an argument about the legality of the proceedings, but that's a separate issue. You may proceed. Good morning. May it please the court, Michael Tanaka, appearing on behalf of Appellant Elhuzayel. Mr. Gordon will represent Mr. Battley and we're splitting the time ten minutes apiece. This case is a terrorism case and terrorism at bottom by its very definition is designed to invoke fear. But that doesn't mean that just because it's a terrorism prosecution that fair trial guarantees are no longer applicable. And I think that's what happened here. I want to discuss two aspects of that. First, the evidentiary issue about the photos and second, the sensing. Now here on the terrorism counts, the government's basically almost entirety of its case was centered around parading Mr. Elhuzayel's, Mr. Battley's social media posts are complete with every photo, gory photo attached to all those tweets and retweets. And so let me ask you about that. So it seems to me that the tweets and the photos that they accompanied were relevant, given that the defendants were saying our intent wasn't anything about supporting terrorism. Our intent was just to go get married. At that point, it seems like the tweets, at least some of them are relevant. Looking at them, they're very horrifying. But once you have some horrifying photos like that, like how much difference does it make if you have more of them? It seems like you needed the government needed to show some of them. And it seems like you're arguing they showed too many. But I don't know if the reaction gets that much bigger when you see more of them than after you just see some of them. The relevance is, and it's, you know, I'm not gonna say marginal, but the photos themselves and the contents of the tweets don't really add very much. You can get all the relevance you need out of it by saying, you know, they were clearly ISIL supporters or whatever. And they kept retweeting the social media accounts of these people for a long period of time. I thought your argument was that it's not so much the tweets, it's the adding to it of all these gruesome photos that they were tweeting to other people. And the government that was piling on is your argument, isn't it? That's essentially, and Judge Freeland's question is, once you see one, does 25 make a difference? So the next question is, what do we, we review the, you're not arguing this stuff was irrelevant. You're arguing that you're making a four or three argument, aren't you? That's correct. And we review the district court there quite deferentially. Why did this step over the line? Assuming the evidence is relevant, how can we conclude that it's prejudicial value was so unfair that it outweighed any probative value? The operative word is unfair prejudice. So it has relevance. The operative word is unfair prejudice in light of outweighing probative value, right?  That's the language in front of me, but you know, four or three. So the inference of intent is there just from recounting the history of the tweets. So what does the, what happens now then when you add the photos to this? I mean, did the defense ask for only the tweets and no photos? I wasn't sure there was such an objection exactly. There was an objection after some of them have been shown that some of them were unobjected to. That's correct. So this is back to my question. Then once you see several gruesome photos that were unobjected to, so I don't see how we can say that was error. I understand your argument that the rest was sort of cumulative, but it's also cumulative in terms of the prejudice reaction that you're worried about. Right. But then the relevance gets overwhelmed by this other inference. And that inference is that Mr. Hell, you say, oh, Mr. Badawi are the same as Jihadi. John is slicing these heads off. They stand in as a proxy for that in the minds of the jury, because they keep seeing this over and over again. The judge did give a limiting instruction. I'm never sure they work, but our case law seems to assume that they work. They gave a limiting instruction only with respect to the photos of the related to 9-11 and that there was no limiting instruction. And the judge thought that there was no need for one with respect to the ISIL photos and the beheadings. But your answer to Judge Friedland is that, as I recall, and I have to go back and match up the objections and the photos, a bunch of really gruesome photos came in absent objection. And then a bunch of more gruesome photos were offered and objections were made. So your argument is really that it was cumulative, isn't it? Because let's assume we show the jury the most gruesome photo in the world and then we show them without objection and we show them four more gruesome photos over objection. Can we really conclude the other four were prejudicial? Well, the other and admittedly, this is a tougher argument legally, but the other argument is that it was plainer to admit any of them. And there's I don't believe the government cited any case where gruesome photos were admitted for this purpose. And even one in the one they sanitized by just describing it. You wanted to talk about the sentence and I wanted to make sure you didn't run out of time before you did. The sentence also is a highly deferential standard. I understand that. But what happened here, and I think in part because of the guideline and the briefing goes into why that guideline is is wildly inappropriate here in the sense that it's a one size fit all guideline. Well, you know, Mr. Lee's al was convicted of a terrorism related offense. He did not do any terrorist acts. He wasn't charged with doing any terrorist acts, but he was sentenced as if he were a terrorist. And in that sense, it makes no distinction between the really dangerous and scary people running around in this country and someone who, like him, had just. The jury found that he was on his way to do terrorist acts. I mean, in that sense, he's just on his way. But again, even then there's gradations. They found his way and given the government's case for all it's worth to travel to Syria to engage in a war against Assad. But that's a that's a far cry from, you know, but that's not what the jury. I mean, the jury must have found the terrorism part to to convict him under these this statute. Well, he was convicted of providing material support. So and he was going the government's theory and what the jury found was that he was going there to support ISIL. But, you know, and ISIL is a terrorist organization. There's certainly no dispute about that. But that doesn't mean that he was going over to become a terrorist in the sense that. I understand the difficulty in the argument because of the standard of review. But how would we say the district court erred? He did look at comparative sentences. Because he just didn't give them the weight you thought they should get. And maybe maybe I would agree with you. But in what way did the district court err? Well, I'm not making a procedural unreasonableness. Making a substantive unreasonable. Tell us why this is. Substantive unreasonableness is normally determined by looking at the other defendant in the case, for example. That doesn't help you here. And looking at comparable cases. And the district court, you submit a comparable case to the district court. And he said, well, in those cases, this guy cooperated. This guy pleaded guilty. They're all different in some way. So what do we do with that? Well, at some level, and I admit that, you know, it's rare, especially from a pellet perspective. But it's just so wrong that you find it substantively unreasonable. Now, you know, I admit the district court ticked all the boxes and checked all the facts. But this case stands alone as someone, except for, of course, his co-defendant, someone who got 30 years for buying a plane ticket, you know, with some notion that he was going to get off in Istanbul and make his way across the desert somehow and do something. That's just not the kind of person that we want to sentence to 30 years in light of all the really dangerous people who have done far worse things or planned far worse things running around. The sentence just seems excessive. Thank you, counsel. I'll attempt to give each of you a little bit of time for rebuttal because we took you right to your limit. Thank you. Mr. Gordon. May it please the court. Counsel, my name is Jeremy Gordon, and I represent Muhammad Badawi. He's one of the co-defendants in this case. Mr. Badawi was convicted and sentenced in a joint trial with his co-defendant. And both of them, I believe, received 360 months in federal prison. We appealed on several issues. And in my time, I'd like to first discuss the motion to sever. And then after that, I'd like to discuss the photograph of Osama bin Laden and the 9-1-1 hijackers that was found on his phone.  First, it was filed before trial, and it was denied. And then during the course of the trial, it was re-urged, and that was on the third day of the trial. And it was also denied at that time. But it wasn't renewed at the close of all evidence. That is correct. And normally, you have to do that. So tell us why you get outside that rule here. All right. So when we look at Vasquez Velasco, we see that in Vasquez Velasco, there was a situation where it was brought up at the beginning of the trial and also brought up during the course of the trial. Now, in Vasquez Velasco, it was not brought up at the close of all the evidence. But in that case, they indicated that you get to a point where you get to a point where pursuing the severance motion has been done to the point where to pursue it even further would become a formality. That's what the court decided in the Vasquez Velasco. Now, it's also a mission to the court that in this situation, it was brought up at the beginning of trial, it was brought up in the middle of the trial on day three, and then there was more information about the severance that happened later on with regard to the co-defendant's statements. And at that point, and especially— Well, that's what I wanted to ask, because the fact that the judge denied it on day three, does that tell us he would have denied it again after the co-defendant's statements came in? In other words, that happened after day three, did it not? That happened after day three. Right, so the purpose of the rule then is to say, well, maybe it was okay to deny it on day three, but now that we have the co-defendant's statements in, judge, you really ought to sever this. And he didn't renew it at that point. So why isn't that a problem? Well, Your Honor, it would have been better, in my opinion, if it had been renewed at that point. But you still have a situation where the court knows, because with dealing with the motion— dealing with the co-defendant's statements, the court indicated off and on through that portion, we're dealing with this, it's a completeness issue, and y'all are the ones that wanted the joinder. Y'all being the state—I'm sorry, judges, I'm from Texas. Never apologize for being from Texas. So then when you get to that point, the statements by the court at that time also indicate that it would have been— and it's our position that it would have been fruitless at that point for them to renew it, especially after bringing that up. And the court said something about the Ninth Circuit can review this, right? Suggesting that this was preserved at this point? Well, that was on day three. So on day three, the court said, I'm going to deny the motion as ever. We're going to talk about this right now. We're going to put this on the record so that y'all can make your arguments. And then there will be a record of all this for the court. And so then at that point, it's our position that trial counsel had made her argument, made all the argument that she needed to make, made enough so that to further bring it up, to bring it up again after the co-defendant's statement. Let's assume we agree with you that it was preserved. Tell us why it was an abuse of discretion for the judge to deny the motion as ever. All right. So with regards to the prejudice when, I'm sorry, so with regards to the substance, we know that under Tutick that when a, that you can have mutually antagonistic defenses when one person implicates the other one and then the second person says, I was not involved. In Tutick, they referenced a Fifth Circuit case where they discussed that. And in this particular case, in this particular case, Baudouin's position during the opening arguments and during the course of the, during the closing arguments and other places was, I got duped. I got duped, I got duped by Al-Hazal into giving him this money so that he could go overseas, so that he could marry this person. So it's important for me to indicate that Baudouin didn't want to go overseas. Baudouin didn't want to marry anybody. He gave this money to Al-Hazal because it's in his position that he got duped. And Mr. Al-Hazal's argument was, I was just going over there to marry someone. I don't even, I'm fighting the fact that ISIL is even a. So I don't understand how these are antagonistic. It seems like both people, both defendants were saying the plan was just to send someone to get married. It seems like those are consistent. So I have a lot of trouble understanding this antagonistic argument that you're trying to make. Yeah, Mr. Baudouin says, gee, I just thought I was sending somebody over to get married. His co-defendant says, that's right. Maybe he duped him into giving him the money to get married, but they both say neither of us had any terrorist inclinations. We both thought this was money to get married. Now maybe Mr. Al-Hazal, I mispronounced his name, the co-defendant lied about whether or not he wanted to get married. Maybe he wanted to go for some other reason. But that's not an antagonistic defense with respect to the terrorism charges, is it? It's our position that it is. It's our position. We know that when we look at mutually antagonistic defenses, the most common ones are when two people are pointing at each other saying, oh, the guy's dead. He did it, he did it. Right, okay. But in this particular case, it's our position that the fact that Mr. Al-Hazal duped Mr. Baudouin into giving him the money, when Mr. Baudouin was completely innocent. But was it your position that Mr. Al-Hazal did so in order to aid a terrorist organization? See, I don't think that was true. I think your position was he duped him into giving him the money. But it wasn't because he was going to aid a terrorist organization, you know, despite his unwillingness to do so. I believe that's true. I believe that's true that it was not specifically for the purposes of going overseas to be a part of ISIL. But it's still our position that that duping in and of itself is enough in order to create the mutually antagonistic defenses. But why? What's contradictory about it? The thing that's contradictory, the first thing that's contradictory about it is that Mr. Baudouin indicates that he was willing to stipulate to ISIL being a foreign terrorist organization when Mr. Al-Hazal was not willing to stipulate to that. But the second thing. That's also not really contradictory. It's just a different way of presenting the issue or evidence. I mean, I don't know that that's like really inconsistent. He's just conceding something the other guy isn't. It's our argument that it's our argument that that the fact that they did that, the fact that Mr. Baudouin was conceded that when Mr. Al-Hazal did not, created a mutually antagonistic defenses because it creates a situation where Mr. Baudouin is completely pointing the finger at Mr. Al-Hazal. But that's the duped theory. I mean, that's fine. So your theory was I'm pointing the finger at him. I was duped. That's not inconsistent with anything that's going on with the co-defendants trial. That's I mean, I don't understand where the inconsistency is still. Well, our position is that our position is that that it's our position is that it's inconsistent because because although although. It was it was that Mr. Baudouin wanted to it was that Mr. Baudouin was doing it just to help us for now and that he was and that he was duped. That's that's that's our argument goes to. But, you know, this is repetitive, but claiming to be duped.  With the co-defendant. We would we would submit that it is. It's not necessarily, you know, in other words, it's not necessary for one to be acquitted and the other. Well, it's not necessary. For your client to be acquitted, that. The co-defendant. Be convicted. Right. Either way. I mean, your defense is almost independent of that, of what happens to the co-defendant. When I say your defense, I mean, the being duped defense. Our argument is that if you believe that Mr. Baudouin, that Mr. Baudouin was duped, that he was duped by Mr. El-Hussein, then you would then the jury would also be able to believe that Mr. El-Hussein was it was planning to go the whole time and that he had that he had basically pulled the rug out under Mr. Baudouin. So that's true. Let's assume that your argument to the jury is look. Maybe Mr. El-Hussein committed these crimes and the way he got to do so was he duped my client. Mr. El-Hussein didn't present an antagonistic defense to that. His defense was no, I didn't, you know, I didn't, I didn't intend that anybody committed terrorist acts. So it was sort of the same defense. Was it not? Well, I believe. I believe that I believe that, that, that, that. It's a it's a situation where you've it's a situation where where it's. By, by, by him, by Baudouin pointing the finger at Mr. El-Hussein. That is what creates a situation where the where the joint would have been more appropriate. So it seems like what is the word antagonistic is what's in the case law. But that means there's a logical contradiction. It seems like maybe what you're trying to say is it's antagonistic in the sense that it's mean or something like that. Baudouin is blaming his co-defendant and that is antagonistic because he's making some kind of they're mad at each other point. But that's not what antagonistic means in the case law. Is that what are you trying to say? It was antagonistic because he's blaming him and that shows they're mad at each other. So they're antagonistic to each other in that sense. I wouldn't I wouldn't I wouldn't say that because I don't believe that that is what is what is going to get Mr. Baudouin there. What I would go back to is that is that part of TUTIC where it says that one person implicates the other one and the other one says nothing. That's that that's that's where that part of TUTIC comes explains what mutual exclusivity is. And in order and that there is enough to in order in order to create the the the what we're going for. Thank you, counsel. I'll give you each a little bit of time for rebuttal to hear from the government. And let me just make clear for the record before there's a number of other arguments that are made that are preserved. We don't need you to make them out today. We are well briefed and we will. Good morning, your honors. May peace accord. For the United States. Intent was the central issue at trial in this case. And the district court well understood that to be the central point of intent. What is the intent requirement? The intent requirement here as to the terrorism offenses are as to conspiracy and attempt and aiding and abetting. So with regard to conspiracy intent to engage in an enter into an agreement. And as to the attempt intent to make that attempt and aiding and abetting would be the intent to aid and abet the attempt by the codependent. And so the intent here was the central issue at trial. Well, I don't think anybody doubts that. Here's here's the problem. And maybe it's not for us. There's a lot of photos in this case. And counsel's point, which I think is well taken, is at some point they were excessive, may not have been prejudicial. That's a separate issue. Does the government have some obligation in conducting a trial like this and in limiting the amount of evidence? It's only is introduced for the purposes of showing intent. It's not the substantive crime itself. So that the jury isn't overly swayed by emotion. Certainly, Your Honor, the government does have the obligation to many photos and tweets where they're here. Altogether, there were 200 by my count of the total exhibit list of social media photos and tweets and such that were admitted at trial. And that was just a small portion of the overall evidence. Their objection, I take it, is not so much to the tweets, the actual words that people use, but the appended photos. And I think you're quite correct in saying we are entitled to get some of them in to show their intent. The question is, were you entitled to get all of them in? I would submit yes for these reasons. And if I may explain the categories of social media evidence that was submitted here. There's four categories. Eleuzeo's Twitter exhibits, Badawi's iPhone exhibits, Badawi's Facebook exhibits, and Eleuzeo's USB drive evidence. Those are the four categories of exhibits that are challenged here on appeal. Badawi's challenging just four items, four photos. Three photos, two of Bin Laden, one of Atta, and the fourth of World Trade Center on fire. No challenges, I understand, to the Jihadi John. Not from Mr. Badawi. Mr. Eleuzeo is challenging 41 exhibits here. And they're coming from the four different devices or platforms, if you will. And he's challenging 13 of the 71 of his tweets that were admitted at trial. And among the Facebook exhibits, there were 31 that were admitted, among which this is from Mr. Badawi's Facebook account. And only one is being challenged, and that's the World Trade Center photo. From iPhone, there were 65 admitted, of which Mr. Eleuzeo is challenging 11. And Mr. Badawi is challenging three, and those three are subsumed within the 11. I think his better argument is the, like, plain error one, because it seems like basically your point is what my question was about. Once you have a bunch of these, how does a few more matter? And you're basically saying they only objected to the few more, so it couldn't possibly have mattered. But maybe now he's trying to say, well, okay, let's just look and see whether it's plain error to admit any of them. For the most part, because there were no objections below, most of these exhibits should be reviewed on plain error. Only a small portion would be on abuse of discretion. And to answer your question. I don't believe there's a plain error argument made in the briefing on those. I may be wrong. We have certainly briefed that, Your Honor, and made. No, you agreed. But go ahead. Tell us why, assuming plain error is in front of us. At least some of the more gruesome ones weren't plain error. So the government had the obligation to demonstrate to the jury, given that these are men's ray offenses, essentially, and to meet that burden of proof beyond a reasonable doubt. That means they're relevant. But they're not saying they're not relevant. At least, that's not a good argument. The real argument is, look at 403. At some point, prejudice overwhelms relevance. With respect to whether objected to or not. The worst of the photos, and you can figure out which one it might be. At that point, it's only being introduced not to show that they committed that act, but that they sympathized with that act. At some point, doesn't it cross the line? Here, no. El Uziel and Badawi engaged in a conspiracy that was at least seven months old. El Uziel began tweeting actively nine months before his attempt to leave the country. And over that period of time, you have a clear evidence of oath-taking to support ISIS on October 21, 2014. After that point, El Uziel is opening, there's a pattern of El Uziel opening multiple Twitter accounts, after he was suspended by Twitter, to express support for ISIS and tweet and retweet these different photos that are at issue here. And so the government had the burden to show that there was a conspiracy over at least a seven-month period, if not longer, between these two individuals, both by tweeting, both of them tweeting, both of them sharing information about their support for ISIS. And also having a pattern of going from account to account to account to show their agreement in this conspiracy and their goal to send El Uziel as material support, as a fighter. And these tweets show what their intent was, what their goal was, which was to have El Uziel go and serve as a fighter. So not only were they probative, deeply, deeply probative, because both defendants possessed these photos, they expressed themselves through these photos and tweets. Not only do they show their agreement, but also it culminates in the intent to attempt, make that attempt on May 21st, 2015, on the part of Mr. El Uziel and to aid and abet specifically. And we're perhaps missing each other here. I don't doubt that they're relevant. I don't doubt that they tended to show what the government had a burden to show. I guess my question was, at some point, does the relevance of photos just become overwhelmed by the gruesomeness of some of them? And does that lapse into prejudice? It may in a different situation. It did not here in this case, because the government was selective in its introduction. And the way the photos and the tweets were introduced were presented in groups without describing any of the tweets. You didn't say, here's one of this, here's one of that. That's right. As the court will note in the transcript, everything moves very briskly. The one agent who testified in omitting these testified for a total of about eight hours over two days. And there were over 250 exhibits submitted. And he was rarely asked about the substance of the tweets. And those questions about the substance of the tweets were really about identification, about foundation, about explaining the difficult to understand terms. Were all these images sent into the jury room at the deliberation? Yes, Your Honor. And they had whatever they needed to show the images, right, to themselves, the jury? They were presented with paper copies of these. Paper copies of each exhibit? That's correct, Your Honor. All right. Now, were there any questions coming out of the jury during the deliberations concerning these images? Not that I recall. I don't believe there's any record in the case that shows that. And I would suggest to the court that this case is far, in terms of the prejudice that Judge Hurwitz, you're asking, if there was any significant amount of prejudice here, it's far less than what we see in cases such as Hamoud that the government has cited, where there were six-plus videos, including car bombing videos, or in the Muhanna case, where there were more than 30 video clips, including video clips that show terrorist propaganda. And here, no video was shown that were connected with the social media posts. We could have shown the videos, but we chose not to. And one of those videos was linked to one of the tweets, and that showed beheadings of Christians on Libyan shore, which the government decided not to introduce at trial. And you will also see in the final exhibit list that there are a number of exhibits that we could have tried to admit, but we chose not to. And so the government exercised restraint and prudential decision, and the district court reviewed every document carefully and admitted them weighing properly the four or three factors. And so we submit that there is no error and no abuse of discretion or plain error as to the exhibits that are being challenged here. Could you address the motion for severance? Yes, Your Honor. So we're arguing for a waiver as our primary argument, but also if the court has questions about the actual merits, I can get to that directly. I'd rather you got to the merits. What I hear today is one person saying, I was duped into going to – into getting a plane ticket to go to Turkey and Israel, and I had no bad intent. Or I was duped into giving a guy the money to do this. I had no bad intent. Maybe he had bad intent, but I don't care. Why isn't that an antagonistic defense? Respectfully, Your Honor, that argument that's coming from Mr. Badawi's counsel is really – does not really meet the standard or the – So let me change the facts a little so we're not mired in this case. Let's assume a bank robbery is committed with my car. And the government wants to show that I conspired with the guys who actually did it to let them have my car. And my defense is no. Somebody has to borrow my car to take his sick grandmother to the office, to the doctor's office. And I said, sure. Are our defenses antagonistic in the case? The other guy simply says, I didn't rob the bank. And I said, I don't know whether you robbed the bank or not, but I didn't give you my car to rob the bank. There is some antagonism there, isn't there? There may be some tension, but that's not the standard. The standard is whether the core of co-defendant's defense was so irreconcilable that that defense precluded my acquittal. And that would not happen in your hypothetical, certainly not here. The claim that my co-defendant duped me is a- It's possible to evict both of you. That's correct. And believe the end. I understand. That's your- That's what you think the legal test is. What I just articulated is- What case do you draw that from? That comes from Tutick. That comes from Throckmorton, what we've cited in our brief, Your Honor. And this court has enunciated that test over and over in multiple cases. So as to the question of the antagonism, that really has to do with- That really applies in the case, Tutick's case, where really it could be one defendant or the other who assaulted the victim there. It had to have been one or the other, and they were pointing fingers at each other. That did not happen at trial in this case. The waiver issue that you urge is not jurisdictional, is it? In other words, we have the discretion to take up the merits in this case, do we not? My understanding is that when there's a waiver, it's not reviewable. Right, but if- I guess the question is whether we have to determine whether or not it was clear on this record that renewing it thereafter would have been futile. That's correct. There are exceptions, and this court can find that the defendants have met the exceptions, which we, of course, argue that they do not meet the exceptions of diligent pursuit. So by what standard do we review whether they've met the exceptions? Since the district court never, obviously, had the rule on that. What's our standard of review of their argument? I don't know the answer to that question, Your Honor. Oh, yeah, that's why I asked. It sounds like you're saying we have to figure out whether they met one of these exceptions. If we think it's easier to just say there's no antagonism here, can we just say there's no antagonism here, or do we have to figure out whether this was preserved? Because the parties have raised the issue, because the government has raised the issue, I believe that the court should, and because of the facts of the case are such, the court should first look at and analyze the waiver issue. You think that's jurisdictional. In other words, we can't move on to the merits unless we find a waiver. See, normally, in a case, we might say, if we agreed with you on the merits, we might say the waiver issue is tough, but we don't have to wrestle with it because we've gotten to the merits and we believe the government prevails. But you're saying we can't do that. If the court, that's correct. I know we can do whatever we want. I'm asking whether you think we have the power to do that. If the court does not find that the exceptions were met, I would submit that the court does not have power to do that. And what case do you cite for that? I do not have a case, Your Honor. Good. I want to make sure you address the sentencing during the time that you're up here because it's a long sentence, at least compared to others in cases that were provided to us. I'm not sure what our ability is to deal with it, but on the merits, how do you defend it? Yes, Your Honor. Before I get to the sentencing issue, I just want to make sure that the court has no questions with regard to the jury instruction issue. Okay. It was well briefed on both sides. We understand. Thank you, Your Honor. So as to the sentencing question, as the government understands the defendant, Defendant Elizalde's argument, the core of that argument is that the district court should have exercised its Kimbrough discretion in disregarding or disagreeing with the 3A1.4, the terrorism enhancement, and varied down from 30 years, which is the low end of the guidelines. And we disagree with that strongly because that's not what Kimbrough teaches. Kimbrough provides district courts the discretion to have a based on policy disagreement to vary downward, but it doesn't require it. And here there was no Kimbrough issue raised below, and the court made it very clear that it agrees with the application of the terrorism enhancement at sentencing and asked the defense whether the court had made a proper calculation, and the defense did not object, made no objection. I don't think that's their objection on appeal. I think their objection is that it's a substantive matter, not a procedural matter. I think counsel correctly said the district court checked all the boxes. As a substantive matter, with respect to at least one of the defendants, the argument is 30 years is just too long. And when you look at other sentences that people have gotten for doing worse things, they didn't get that. Now, counsel recognizes that our ability to deal with that is quite limited, but I'd like to hear the substantive response to it. Yes, Your Honor, as to the substance of reasonableness of the 30-year sentence, the district court made a very clear and detailed factual finding that supports it, applying 3553A factors, and this court should exercise great deference to that process through which the district court reached the sentence. Assuming we do, but I still want to hear from you why you think it was a substantively reasonable sentence. As the district court made that finding, the district court went through the facts that were proven at trial. What's the procedural answer? What facts do you think justify the 30-year sentence is, I think, the question. The district court found that the defendant was unapologetic about his crime and had repeatedly made statements throughout his conspiracy, not only in support of ISIS, but showing his desire, his intent to join ISIS as a fighter. The district court pointed out specific statements that the defendant made, expressing his desire to go fight and engage in violence. And so at the end of the district court's factual finding, the district court said there is no remorse. There is no repudiation of ISIL. There is only the message of death and destruction. And the district court was greatly concerned that at age 55, when Mr. El Uziel was expected to be released from prison, that he would still have vigor in him to commit terror. So based on the district court's findings of defendant being an unapologetic supporter of ISIS and having that willingness to engage in violence, the district court made a proper finding that he represents danger to the community. The community should be protected from the defendant. That deterrence is absolutely necessary. Rehabilitation is going to be very difficult. And as to the disparity issue, the district court was presented with a fairly lengthy sentencing exhibit and papers from the defense showing other cases. But as Judge Hurwitz, you noted, Judge Carter noted other cases, notably another case that had recently gone on in Santa Ana in the Central District of California, and distinguished that case and other cases and said, here, based on these facts, based on what this defendant has shown, the low-end sentence of 30 years is appropriate. And that decision should be – that decision did not show any abuse of discretion. Unless my colleagues have any questions, we thank the government for its arguments. We'll give each of the defendants a minute for rebuttal. Let me end where I began. Just because this is a terrorism case does not mean that anything goes. I heard the government say that every single one of those photos was justified. And at best, I would submit that one of them was justified. I guess the relevance is that if they're retweeting a gory photo, it shows some identification with that. But there was absolutely no need to show them all. And they were all displayed. Make no mistake about that. I don't care how quickly they went. They were all displayed for the jury. And to the argument that the judge exercised discretion, I don't see that in the record at all. The only response he made to the objection was that it was on a different communication module, not anything substantive. Well, just that we found these photos, and, of course, in this digital age, anything that's digital will be on all kinds of things, doesn't give it any more relevance. And to suggest that in any terrorism prosecution, if you find these, you can display them to the jury as long as intent says issue is just wrong. Counsel, thank you for your argument. Mr. Gordon. What I want to point the court to are the statements that were made by Mr. Badawi's counsel, especially in opening statements. When counsel indicated Mr. Ejozeo was lying, he was stealing money and betraying people who worked hard, my client didn't know that Mr. Ejozeo was not planning to get married. And the other statements that counsel made in the opening statements, when you take those statements and you take the defense that both of them are making, Badawi indicating that he was just trying to help his friend and didn't know about ISIS, and Mr. Ejozeo saying, I was just trying to get over there. It's our position that that creates a situation that is so irreconcilable with the core of his own defense that the acceptance of one of their theories means that you'd have to convict the other under Throckmorton. And that is all the time I have. Particularly thank counsel for their arguments and briefing in this difficult case. We appreciate on both sides the effort put in on behalf of the government and the defendants in this case. And with that, we are in recess. All rise. This court for this session stands adjourned.
judges: Tashima, Hurwitz, Friedland